IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TAMICA LANDRUM GRAHAM o/b/o** | * | |
| **C.L.G.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| vs. | * | CIVIL ACTION NO. 18-00206-JB-B |
| | * | |
| **ANDREW M. SAUL,**[1] | * | |
| **Commissioner of Social** | * | |
| **Security,** | * | |
| | * | |
| **Defendant.** | * | |

## REPORT AND RECOMMENDATION

Plaintiff Tamica Landrum Graham (hereinafter "Plaintiff") brings this action on behalf of her minor child, C.L.G., seeking judicial review of a final decision of the Commissioner of Social Security denying Plaintiff's claim for child supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.* This action was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Upon careful consideration of the administrative record and memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

---

[1] The Court takes judicial notice of the fact that Andrew M. Saul is now the Commissioner of Social Security. Accordingly, pursuant to Fed. R. Civ. P. 25(d), the Clerk is **DIRECTED** to substitute Andrew M. Saul, Commissioner of Social Security, as the Defendant in this case.

## I. Procedure History[2]

Plaintiff filed an application for supplemental security income on behalf of her son, C.L.G., on January 27, 2015.[3] (Doc. 17 at 202). Plaintiff alleged that C.L.G. has been disabled since his date of birth, February 15, 2011, due to myoclonic epilepsy and seizures, cerebral palsy, ataxia, pervasive developmental disorder - not otherwise specified, autism, developmental delays, sensory processing delay, anxiety, hyperactive and defiant behavior, behavioral abnormalities of unclear etiology, orthopedic delay, and ADHD symptoms. (Id. at 202, 239). Plaintiff's application was denied at the initial stage on May 21, 2015. (Id. at 154). Plaintiff filed a timely request for hearing, and on August 19, 2016, Administrative Law Judge Roger A. Nelson (hereinafter "ALJ") held an administrative hearing, which was attended by Plaintiff, C.L.G., and Plaintiff's attorney. (Id. at

---

[2]  The Court's citations to the transcript in this report and recommendation refer to the pagination assigned in CM/ECF.

[3]  An unfavorable decision on Plaintiff's prior claim for supplemental security income on behalf of C.L.G. was issued by an Administrative Law Judge on December 28, 2012. (Doc. 17 at 105). The Appeals Council denied Plaintiff's request for review of that decision on January 8, 2014. (Id. at 127). Plaintiff did not seek judicial review of the prior unfavorable decision. (Id. at 62). Pursuant to the doctrine of administrative finality, the unfavorable December 28, 2012 decision stands as the final decision of the Commissioner with regard to C.L.G.'s disability status up to that date. (See id. at 15). Accordingly, notwithstanding the February 15, 2011 onset date alleged by Plaintiff, the earliest possible disability onset date for C.L.G. is December 29, 2012.

57-58). Both Plaintiff and C.L.G. provided testimony at the administrative hearing. (Id. at 69-98, 101-04). On April 21, 2017, the ALJ issued an unfavorable decision finding that C.L.G. is not disabled. (Id. at 12). The Appeals Council denied Plaintiff's request for review on March 6, 2018. (Id. at 5). Therefore, the ALJ's decision dated April 21, 2017, became the final decision of the Commissioner. (Id.).

Having exhausted her administrative remedies, Plaintiff, proceeding *pro se*, timely filed the present civil action. (Doc. 1). Oral argument was conducted on June 3, 2019 (Doc. 25), and the parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. Issues on Appeal

1. **Whether the ALJ erred by failing to resolve contradictions in the record?**

2. **Whether the ALJ breached his duty to fully and fairly develop the record by not requiring C.L.G.'s doctors to provide additional detail and explanations of their records and by not soliciting testimony from additional witnesses?**

3. **Whether the ALJ's assignment of great weight to the opinions of C.L.G.'s consultative neurological examiner is supported by substantial evidence?**

4. **Whether the ALJ erred by assigning "too much" weight to the teacher questionnaire completed by C.L.G.'s general education pre-kindergarten teacher?**

**5. Whether the ALJ erred by cherry-picking evidence to deny Plaintiff's claim?**

**6. Whether the ALJ failed to properly consider Plaintiff's personal credibility?**

## III. Factual Background

C.L.G. was born on February 15, 2011 and was three years old at the time Plaintiff, his mother, filed an application for supplemental security income benefits on January 27, 2015. (Doc. 17 at 202). At the time of his administrative hearing on August 19, 2016, C.L.G. was five years old and in kindergarten. (Id. at 70, 91).

At the hearing, Plaintiff testified that C.L.G. was born premature at approximately twenty-eight weeks. (Id. at 75). She also testified that C.L.G. still walked on his toes and suffered random, unexplained falls four or five times per day, which was down from approximately twenty times per day previously. (Id. at 80, 94). According to Plaintiff, C.L.G. wears ankle-foot orthoses ("AFOs") to help his balance and prevent him from falling, but the doctors had ruled out orthopedic issues as the cause of C.L.G.'s falls. (Id. at 94-95). Plaintiff also testified that C.L.G. experiences seizures, which have improved with medication. (Id. at 81-84). Plaintiff further testified that C.L.G. is taking medication for intense headaches, which he normally experiences "a couple times a week" for fifteen to twenty minutes, after which he

normally sleeps for about 90 to 120 minutes. (Id. at 84, 95-96).
Plaintiff described C.L.G. as "a smart little boy," but noted that
he has symptoms of attention deficit hyperactivity disorder
("ADHD") and has trouble staying focused and retaining
information. (Id. at 86-87). Plaintiff testified that C.L.G. has
a "bad sleeping problem," for which he takes medication. (Id. at
87). Plaintiff also testified that C.L.G. has behavioral problems,
including aggressiveness with her and other children. (Id. at 87-
88). Plaintiff further testified that C.L.G. has asthma, for which
he is prescribed Albuterol and Pulmicort, and that his asthma has
improved on medication. (Id. at 92-93). Plaintiff explained that
she gives C.L.G. his nebulizer twice a week, when she hears
wheezing in his chest, but that C.L.G. has not experienced asthma
attacks to the point where he was unable to breathe. (Id. at 97-
98).

Plaintiff completed a Function Report dated January 27, 2015
and therein indicated that C.L.G. is limited in his behavior toward
other people and in his ability to pay attention, understand and
use what he has learned, communicate, write, dress himself, bathe
himself, and control his bowels and bladder during the day. (Id.
at 223-28).

As of June 7, 2016, Plaintiff listed C.L.G.'s medications as
follows: Keppra and Depakote for seizures; Clonidine for insomnia
and ADHD symptoms; Polyethylene glycol 3350 for constipation;

Albuterol and Pulmicort for asthma and wheezing; Nasonex and Carbinoxamine for congestion; Naproxen for migraines; and Allegra for allergies. (Id. at 264).

## IV. **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the correct legal standards were applied.[4] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991). "Substantial evidence is more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). In determining whether substantial evidence exists, a reviewing court must consider the record as a whole, taking into account evidence both favorable and unfavorable to the

_____

[4] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

Commissioner's decision.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, at *4 (S.D. Ala. June 14, 1999).

**V.    Statutory and Regulatory Framework – Childhood Disability Law**

The Personal Responsibility and Work Opportunity Act of 1996, which amended the statutory standard for children seeking supplemental security income benefits based on disability, became effective on August 22, 1996.  See Pub. L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. § 1382c).  The definition of "disabled" for children is:

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

See 42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.906.  The regulations provide a three-step sequential evaluation process for determining childhood disability claims.  20 C.F.R. § 416.924(a).

At step one, a child's age and work activity, if any, are identified to determine if he has engaged in substantial gainful activity.   Id. at § 416.924(b).  At step two, the child's physical/mental impairments are examined to see if he has an impairment or combination of impairments that is severe.  Id. at § 416.924(c).  Under the regulations, a severe impairment is one that is more than "a slight abnormality or a combination of slight

7

abnormalities that causes no more than minimal functional limitations[.]" Id. To the extent the child is determined to have a severe impairment, at step three, the Commissioner must then determine whether the impairment or combination of impairments meets, or is medically or functionally equal to, an impairment listed in Appendix 1 of 20 C.F.R. part 404, subpart P, and otherwise satisfies the duration requirement. Id. at § 416.924(d).

A child's impairment(s) meets the listings' limitations if he or she actually suffers from limitations specified in the listings for the severe impairment. Shinn v. Comm'r of Soc. Sec., 391 F.3d 1276, 1279 (11th Cir. 2004). A child's impairment(s) medically equals the listings if his or her limitations are at least of equal severity and duration to the listed impairment(s). Id. (citing 20 C.F.R. § 416.926). Where a child's impairment or combination of impairments does not meet or medically equal any listing, then the Commissioner must determine whether the impairment or combination of impairments results in limitations that functionally equal the listings. 20 C.F.R. § 416.926a. To establish functional equivalence in step three, the claimant must have a medically determinable impairment or combination of impairments that results in marked limitations in two functional domains or an extreme limitation in one domain. Id. at § 416.926a(a). The six domains are: (1) acquiring and using information; (2) attending and

completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. Id. at § 416.926a(b)(1)(i)-(vi).

## VI. The ALJ's Findings

In the instant case, the ALJ found that C.L.G., a six-year-old school-age child who was a preschooler on the date his application was filed, has not engaged in substantial gainful activity since his current application date. (Doc. 17 at 18). The ALJ also found that C.L.G. has the severe impairments of a seizure disorder, a disruptive behavior disorder, very mild cerebral palsy with associated developmental delays, and a history of ADHD, as well as the non-severe impairment of asthma. (Id. at 18-19). The ALJ determined that C.L.G.'s impairments do not meet or medically equal the severity of any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924, 416.925, and 416.926). (Id. at 19). The ALJ then determined that C.L.G. does not have an impairment or combination of impairments that functionally equal the severity of a listing. (Id. at 19-32). Specifically, the ALJ found that C.L.G. has (1) less than marked limitations in acquiring and using information; (2) less than marked limitations in attending and completing tasks; (3) less than marked limitations in interacting and relating with others; (4) less than marked limitations in moving about and

manipulating objects; (5) no limitation in the ability to care for himself; and (6) less than marked limitations in health and physical well-being. (Id. at 25-32). Thus, the ALJ found that C.L.G. is not disabled. (Id. at 32).

## VII. **Discussion**

### A. **Plaintiff has not identified any relevant contradictions in the record that the ALJ failed to resolve.**

Plaintiff first argues that the record contains "contradictions of analysis, diagnosis, and prognosis," contradictions between medical and non-medical professionals, and insufficient documentation as to why C.L.G.'s treating providers prescribed certain therapies, medications, and equipment. (Doc. 19 at 3). Specifically, Plaintiff contends that C.L.G.'s treating neurologist, Paul M. Maertens, M.D., and C.L.G.'s consultative neurological examiner, Elias G. Chalhub, M.D., "basically contradict each other." (Id.). Plaintiff also suggests that Dr. Maertens' treatment notes do not match his recommendations for C.L.G. (Id.). According to Plaintiff, "additional review with a 'new set of eyes'" will make C.L.G.'s history and limitations clearer. (Id.). In response, the Commissioner argues that it was the ALJ's duty to resolve conflicts in the evidence, and that Plaintiff is impermissibly asking the Court to reweigh the evidence. (Doc. 21 at 3-4).

As the fact-finder, the ALJ has the duty to weigh the evidence

of record. "The ALJ's task is to examine the evidence and resolve conflicting reports." Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996) (citing Powers v. Heckler, 738 F.2d 1151, 1152 (11th Cir. 1984) (per curiam)); see Richardson v. Perales, 402 U.S. 389, 399 (1971) ("We . . . are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). Here, the ALJ's decision shows that he properly reviewed, considered, and weighed the record evidence.

The record shows that C.L.G. was treated by Dr. Maertens through the Alabama Children's Rehabilitation Service from July 2012, when he was sixteen months old, through at least May 2016. (See Doc. 17 at 464, 856). At his initial visit, Plaintiff reported to Dr. Maertens that C.L.G. frequently stayed up all night, never stopped moving all over the house, screamed, was extremely impulsive, did not pay attention to anything, and ran into things and fell frequently. (Id. at 464-65). She requested a helmet, but Dr. Maertens assured her it was not necessary. (Id. at 465). Upon examination, Dr. Maertens noted that C.L.G. could walk on his heels when he was calm but tended to frequently walk on his tiptoes, and that C.L.G. had normal myotatic reflexes. (Id.). Dr. Maertens also observed that, contrary to his mother's assertions, C.L.G.'s development "[was] not delayed from what I can see, we will just keep an eye on it." (Id.). Dr. Maertens prescribed a small dose of Trazodone to help C.L.G. sleep, as well

as an EEG under deep sedation.  (Id. at 466).  The treatment notes reflect that C.L.G. refused to take the Trazodone, so in November 2012, Dr. Maertens prescribed Clonidine instead.  (Id. at 472).

During C.L.G.'s December 2012 visit with Dr. Maertens, Dr. Maertens diagnosed C.L.G. with ataxia, poor fine motor skills, and developmental delay. (Id. at 312).  According to Dr. Maertens, C.L.G. was extremely ataxic, had poor coordination, fell a lot, and seemed to have a short attention span.  (Id.).  When C.L.G. walked without shoes, he did relatively well, but with shoes, he stumbled around and fell frequently.  (Id.).  Dr. Maertens noted that C.L.G.'s November 2012 EEG had revealed no seizure activity. (Id.).  He instructed that C.L.G. should continue taking Clonidine, which seemed to help him sleep.  (Id.).  He also wrote a prescription for occupational therapy and ordered a brain MRI, which was performed in March 2013 and was normal.  (Id. at 312, 314-15, 459).

C.L.G. was seen by Dr. Maertens on June 24, 2013, and on examination, Dr. Maertens noted that C.L.G. made good eye contact, followed simple commands, had intact cranial nerves, good range of motion, and good bulk and tone.  (Id. at 459).  C.L.G.'s gait was slowed and wide and his coordination was still poor, but Dr. Maertens did not witness any falls. (Id.).  Moreover, Plaintiff reported that C.L.G. was still falling but had already improved, and that she had not seen any seizure activity.  (Id.).

Dr. Maertens' December 2013 treatment records reflect that he diagnosed C.L.G. with status post-prematurity and mild cerebral palsy and noted that C.L.G. had been receiving physical therapy and speech therapy. (Id. at 478). Dr. Maertens also noted that C.L.G. was not falling as much, his motor skills were much improved, his speech was improving, he was talking more, he had great eye contact, he was able to point, and he could stay still a little longer. (Id.). Dr. Maertens further noted that Plaintiff had not been giving C.L.G. the Clonidine as directed, and that C.L.G. needed the Clonidine because without it, he was "all over the place" and did not sleep. (Id.). Dr. Maertens opined that overall, "[C.L.G. was doing] well." (Id.).

At a follow-up visit on June 13, 2014, Dr. Maertens stated that C.L.G. has mild cerebral palsy and had been making a lot of progress. (Id. at 455). Dr. Maertens noted: "For a 3-year-old, the child seems to be really in pace with some of his knowledge. He knows his shapes. He knows his colors. He knows parts of the body and so forth." (Id.). According to Dr. Maertens, C.L.G.'s main problem was that he experienced myoclonic jerks, which occurred intermittently, sometimes two or three times a day, and C.L.G. also continued to fall or lose his balance while walking. (Id.). Dr. Maertens noted that three-year-old C.L.G. was being given a lot of caffeine in the form of Coca-Cola, coffee, and tea, and that this interfered with his sleep and could lower his seizure

thresholds.  (Id. at 455-56).  On examination, Dr. Maertens observed that C.L.G. did well running and walking, had no difficulty hopping on either foot, had no abnormal posturing, made good eye contact, had good social skills, had normal cranial nerves, and his neurological examination was nonfocal.  (Id. at 456).  Dr. Maertens wrote a prescription for a Clonidine refill and scheduled C.L.G. for an inpatient epilepsy monitoring unit. (Id. at 456-57).

On July 8, 2014, C.L.G. was admitted to USA Children's & Women's Hospital for EEG monitoring by Dr. Maertens.  (Id. at 353). Physical examinations at the hospital showed that C.L.G. was alert and oriented, had no focal deficits, had 5 of 5 strength bilaterally, good range of motion in all limbs, and no noticeable spasticity of extremities or clonus, but he did exhibit toe walking when he was excited.  (Id. at 353, 359).  Dr. Maertens observed seizure-like activity on the EEG and prescribed Keppra for seizures.  (Id. at 353-54).

C.L.G. was seen again by Dr. Maertens on December 12, 2014. (Id. at 475).  He diagnosed C.L.G. with cerebral palsy, status post-prematurity, myoclonic epilepsy, and developmental delay. (Id.).  Dr. Maertens opined: "The child is improving markedly, in many ways.  He used to fall all the time, due to jerks, and those falls are markedly improved.  They still occur on occasion, but much less."  (Id.).  He further stated that C.L.G. "was extremely

14

aggressive and hitting, and now we have a marked improvement. He is much more compliant, and of course, he is also somewhat more mature." (Id.). Dr. Maertens continued C.L.G. on Keppra and Clonidine and wrote prescriptions for occupational therapy, physical therapy, and speech therapy. (Id. at 475, 477). Dr. Maertens' last treatment notes in the record are dated May 31, 2016. (Id. at 856). The notes are largely illegible, but it appears that C.L.G.'s chief complaint was listed as "ataxia/toe walk[.]" (See id.).

The record further reflects that C.L.G. was evaluated by developmental/behavioral pediatrician Stephanie J. Anderson, M.D. at the University of South Alabama on September 27, 2012. (Id. at 328). A Bayley-III Scales of Infant Development Tables and Graphs Report was performed, which revealed that C.L.G.'s cognitive ability was within the average to superior ranges of functioning, his language skills were within the average range of functioning, and his motor skills were within the high average to superior ranges of functioning. (Id.). Dr. Anderson noted that although C.L.G. appeared to have some developmental delays, he seemed to have made significant progress since being evaluated by Alabama's Early Intervention System in June 2012. (Id. at 332). A speech/language evaluation performed in October 2012 showed that C.L.G.'s receptive and expressive language skills were within normal limits for his age, that he was showing a very positive

response to speech therapy, and that no significant "red flags" for autism were observed. (Id. at 326).

Dr. Anderson evaluated C.L.G again on April 16, 2013 and noted that C.L.G. was receiving outpatient occupational therapy and monthly speech therapy. (Id. at 317). Dr. Anderson observed a "[c]ute, well-developed boy" who had a normal activity level, made some eye contact, and occasionally smiled. (Id. at 318). Dr. Anderson noted that C.L.G. was frequently on his toes while walking, but his feet were flat when standing. (Id.).

C.L.G. presented to pediatrician Tonya Dobbs, M.D. for a well-check on April 24, 2013. (Id. at 453). On examination, his muscle tone was abnormal, and Dr. Dobbs assessed him with delayed developmental milestones. (Id. at 454). However, during C.L.G.'s two-year-old well-baby exam just five days later, pediatrician George W. Hall, M.D. found C.L.G. to be well-developed and meeting normal growth and development milestones, including using words to communicate, understanding and following simple commands, walking well, stooping, climbing stairs, and stacking three or four blocks. (Id. at 424). Further, Dr. Dobbs' notes from subsequent examinations of C.L.G. in 2014, 2015, and 2016 revealed normal growth and development, normal muscle tone and reflexes, normal movement of all extremities, normal gait and stance, normal motor strength, no vision problems, and normal milestones assessments. (See id. at 448, 450, 452, 834-37, 839-40, 842-43, 845). Although

16

Dr. Dobbs noted that C.L.G. had a history of asthma, she also noted on a number of occasions that he was not given his Pulmicort daily, and both Dr. Dobbs and Dr. Hall typically found C.L.G.'s lungs clear to auscultation, with no wheezing, no rhonchi, no decrease in breath sounds, and no rales/crackles. (See id. at 424, 431-32, 440, 445, 448, 450, 452, 454, 834, 836-37, 839-40, 842-43, 845).

A June 2013 developmental assessment of young children performed by Sharon Beech, M.S.W., showed that C.L.G. had less than a twenty-five percent delay in cognition and communication, which was a marked improvement from the previous year; therefore, he did not requalify for services under the Early Intervention System. (See id. at 335-36).

C.L.G. underwent regular outpatient occupational therapy at Springhill Medical Center from December 2012 to December 2014. (See id. at 481-719). In the notes from his final therapy session on record, on December 19, 2014, occupational therapist Tara Thompson observed that C.L.G. was cooperative, pleasant, enjoyed attention, enjoyed interaction, and participated well in his therapy session with no inappropriate behavior and less distracted behavior, as evidenced by his attending to tasks with minimal verbal cues. (Id. at 718). Ms. Thompson noted that C.L.G. was making great progress but would continue to benefit from occupational therapy. (Id.).

C.L.G. began parent-child interaction therapy at USA Psychological Clinic on July 23, 2014. (Id. at 746). By August 27, 2014, Plaintiff reported already seeing changes in C.L.G.'s behavior following therapy, including picking up toys on his own after playing with them. (Id. at 744). In November 2014, Plaintiff reported that C.L.G. was no longer hitting or biting. (Id. at 737). In December 2014, Plaintiff reported to the therapist that she now felt comfortable with C.L.G.'s behavior and had finally enrolled him in daycare. (Id. at 735). Of note, Plaintiff twice asked the therapists, in November 2014 and again in April 2015, whether they thought C.L.G. showed signs of ADHD. (Id. at 737, 850). Both times, the therapists replied that extensive testing would be needed to diagnose ADHD, but that most of C.L.G.'s behavior appeared to be typical for a child his age. (Id.). At the time C.L.G. and Plaintiff graduated from parent-child interaction therapy in April 2015, it was noted that C.L.G. was at a generally higher level of functioning. (Id. at 850-51).

At Dr. Maertens' referral, C.L.G. underwent a physical therapy evaluation on February 9, 2015. (Id. at 749). At the evaluation, Plaintiff reported that C.L.G. fell two to three times per week, and that she was concerned about how to improve C.L.G.'s abnormal toe walking. (Id.). On examination, C.L.G. had normal tone, ambulated independently with occasional toe walking, performed single leg standing for fifteen seconds bilaterally,

stepped up and down a six-inch step independently without loss of balance, jumped forward without loss of balance on landing, jumped up approximately one foot and landed on two feet, ascended stairs with no handrail in an alternating lower extremity pattern, descended stairs with no handrail step to pattern, performed independent tandem walking on a balance beam, and showed decreased dorsiflexion strength bilaterally. (Id.). It was recommended that C.L.G. undergo physical therapy once every two weeks and wear bilateral AFOs to decrease plantar flexion during gait. (Id. at 750).

At an occupational therapy evaluation on February 11, 2015, it was noted that C.L.G. was "a sweet, nice, and polite" boy who demonstrated good eye contact, fair ability to carry on a conversation with the evaluator, good and consistent posture, and good static and dynamic balance as he manipulated himself around the room, although he toe walked periodically throughout the evaluation. (Id. at 754-55). C.L.G. was able to accurately follow two-step instructions, waited to be told the directions of an activity, required moderate prompting to focus on a task, and was able to sit at a desk for more than thirty minutes without demonstrating any compulsive behavior or signs of needing a sensory break. (Id.). His grasping, visual motor, balance, motor processing, visual processing, fine motor skills, and projected action sequence skills were age-appropriate, and he demonstrated

age-appropriate skills in some self-care, such as the ability to zip and unzip clothing if the zipper was secured for him. (Id. at 755-58). However, based on the Sensory Processing Measure, a caregiver checklist completed by Plaintiff, C.L.G. scored definite dysfunction in social participation, visual processing, tactile processing, and his total score. (Id. at 758). The evaluators stated: "While [C.L.G.] has these deficits, he is performing with success in his environments and therefore occupational therapy is not recommended at this time." (Id.). A speech therapy evaluation was also performed in February 2015 and, after C.L.G. displayed language and articulation skills that were within normal limits for his age and gender, additional speech therapy was not recommended. (Id. at 752-53).

On May 4, 2015, consultative mental examiner Jennifer M. Jackson, Psy.D. conducted a child mental examination of C.L.G. (Id. at 760). Dr. Jackson observed that C.L.G. was pleasant and cooperative, displayed no obvious difficulties with fine or gross motor skills, and displayed no unusual behaviors or signs of hyperactivity. (Id. at 761). C.L.G. was alert and oriented in an age-appropriate manner to time, place, and person, he attended to instructions without apparent difficulty, his attention span seemed appropriate, and he did not appear to have trouble concentrating or seem easily distracted. (Id.). He spoke at a normal pace, his speech did not appear pressured and was easily

understood, and he did not mumble or slur his words. (Id. at 761-62). C.L.G. demonstrated no signs of confusion, loose associations, distortions of thinking, or tangential or circumstantial thinking. (Id. at 762). He could add two plus three, subtract one from two, recall three digits forward, identify the day after Thursday, see an association between socks and shoes, and knew that grass is green, that "stars" shine in the sky at night, and that a dog has four legs. (Id. at 761-62). He could not count to ten, spell "cat" correctly, recall any digits backward, or see a similarity between an apple and a banana or a cat and a mouse. (Id.). Dr. Jackson diagnosed C.L.G. with "Disruptive Behavior Disorder NOS" and stated confusingly: "It appears does not appear that a favorable response to treatment could be expected within 6-12 months." (Id. at 762).

The medical records reflect that in June 2015, C.L.G. complained to Dr. Dobbs of soft tissue right knee pain, which occurred only at night and could last up to twenty minutes. (Id. at 841). A physical examination of C.L.G.'s knees was normal, and Dr. Dobbs noted that she suspected growing pains. (Id. at 842). Nevertheless, she requested consultation by a specialist and, on July 21, 2015, C.L.G. was seen by pediatric orthopedist Adam J. Handwerger, M.D. (Id. at 832, 842). At C.L.G.'s initial visit, Dr. Handwerger observed that C.L.G. had symmetric abduction of both hips, had a little bit of pain with full abduction of the

left hip, and walked with no significant antalgic gait.  (Id. at 832).  Dr. Handwerger noted that x-rays showed no evidence of fracture, subluxations, dislocations, or lesions.  (Id.).

C.L.G. continued to report right leg pain to Dr. Dobbs (id. at 836, 838-39), and his mother took him back to Dr. Handwerger for a follow-up visit on December 11, 2015.  (Id. at 829).  On examination, Dr. Handwerger noted no swelling, deformity, tenderness to palpation, bruising, or evidence of antalgic gait. (Id. at 830).  Dr. Handwerger stated: "He does not seem to be hurting at all today[,]" but he took the precaution of ordering an MRI of C.L.G.'s right leg.  (Id.).

At a post-MRI follow-up on January 8, 2016, Plaintiff told Dr. Handwerger that C.L.G. continued to have a lot of pain in his leg and was falling a lot more and walking with an unusual gait pattern.  (Id. at 828).  However, Dr. Handwerger again noted no swelling, deformity, or tenderness to palpation, and he stated that C.L.G. was able to ambulate well.  (Id.).  Because the MRI showed a possible small osteoid osteoma in C.L.G.'s right femur, Dr. Handwerger ordered a CT scan to confirm or rule out that possibility.  (Id.).  On January 28, 2016, Dr. Handwerger noted that the CT scan showed no evidence of an osteoid osteoma or other abnormalities.  (Id. at 827).  His examination of C.L.G.'s right leg again showed no swelling, bruising, deformity, or tenderness to palpation, and C.L.G. was able to ambulate in the office with

22

no limitation.  (Id.).  Dr. Handwerger stated that it was "most likely growing pains."  (Id.).

On October 25, 2016, Elias G. Chalhub, M.D. performed a consultative neurological examination of C.L.G.  (Id. at 860). Dr. Chalhub noted that C.L.G.'s seizure control was excellent and that he had experienced no recent seizures.  (Id.).  He further noted that C.L.G. "does wear AFOs" and "had in the past toe walked but apparently does not toe walk at the present time."  (Id.). Dr. Chalhub noted that C.L.G. had some behavior problems and had occasional headaches, for which he took Aleve.  (Id.).  Dr. Chalhub stated: "The child apparently acquires learning information and is doing well.  He has some difficulty with behavior with attention. He interacts well with other children.  He manipulates things well with his hands, and he can care for himself."  (Id.).  Examination of C.L.G.'s nervous system showed that his pupils were equal and reactive, his discs were sharp, his vessels were normal, his visual fields were full, his face was symmetrical to grimace, and his lower cranial nerves were normal.  (Id. at 860-61).  Examination of his motor system showed normal tone in the upper extremities, mild increased tone in the lower extremities, 3+ reflexes, and flexor plantar responses.  (Id. at 861).  Dr. Chalhub observed that C.L.G. walked unassisted and did not toe walk, and that C.L.G. could sit, stand, walk, and crawl.  (Id.).  According to Dr. Chalhub, C.L.G. did not appear to need his AFOs, as he did not toe

walk and had no limitation in terms of weakness. (Id.). As his impression, Dr. Chalhub stated that C.L.G. has a history of prematurity, a history of spastic paraparesis, which was much improved, a seizure disorder that appeared to be reasonably well-controlled on medication, intermittent knee pain of unknown etiology, and occasional headaches. (Id.).

After reviewing the foregoing evidence at length, the Court notes that inconsistencies or even contradictions in more than 500 pages of medical, psychological, and therapy records spanning more than five years are to be expected and are not in themselves grounds for reversal. As noted *supra*, the ALJ's task was to examine the evidence and resolve relevant evidentiary conflicts.

Plaintiff claims that the records of Drs. Maertens and Chalhub contradict one another. (Doc. 19 at 3). This assertion is without merit. First, Plaintiff fails to specify which records of Dr. Maertens she is referring to. Dr. Maertens treated C.L.G. on multiple occasions beginning in July 2012, while Dr. Chalhub examined C.L.G. in October 2016. As the ALJ pointed out, and as the record clearly demonstrates, the developmental delays that C.L.G. exhibited as a very young child had largely resolved by the time of the ALJ's decision. (See Doc. 17 at 21). Given C.L.G.'s marked improvements as evidenced by the records summarized above, in addition to C.L.G.'s natural maturation over time, it would be remarkable indeed if Dr. Chalhub's 2016 consultative examination

report was entirely in line with Dr. Maertens' early treatment records.  Moreover, the Court sees no contradiction between Dr. Maertens' most recent legible treatment notes, from December 2014, and Dr. Chalhub's report.  Dr. Maertens' December 2014 treatment records indicate that C.L.G., who was then three years old, was taking Keppra and Clonidine, his falls were markedly improved and reduced, his behavior was markedly improved, he was somewhat more mature, and he was sleeping well with the help of medication.  (Id. at 475, 477).  In October 2016, Dr. Chalhub noted that the five-year-old C.L.G. still took Keppra and Clonidine, that his seizure control was excellent, that he walked unassisted and did not toe walk, and that he still had some behavior problems but was able to learn and interact well with other children.  (Id. at 860-61).

Plaintiff also argues that "Dr. Maertens documents almost opposite of what he recommends for [C.L.G.] in some instances, critical instances, for example speaking of improvements in walking but still prescribes AFO's.  Dr. Handwerger definitely disagreed."  (Doc. 19 at 3).  However, the record shows that C.L.G.'s AFOs were recommended by physical therapist Cheryl Thames (see Doc. 17 at 750), and the only mention of Dr. Maertens prescribing AFOs that the undersigned is able to locate in the record is a report of contact from a voicemail left by Plaintiff in March 2015.  (See id. at 251).  Even assuming that Dr. Maertens did direct C.L.G. to wear AFOs, the Court can discern no inherent

25

contradiction between a finding of improvements in walking and a recommendation to wear orthoses designed to facilitate normal walking. This is particularly true given Plaintiff's persistent complaints that C.L.G. exhibited ataxia and toe walking, despite the fact that, during C.L.G.'s more recent dates of treatment, his treating or examining doctors generally found no evidence of toe walking or gait abnormalities. And, while Plaintiff makes a vague reference to Dr. Handwerger, the Court notes that Dr. Handwerger found no gait abnormalities during any of C.L.G.'s office visits. Because Plaintiff has failed to identify any relevant contradictions in the record that the ALJ failed to resolve, her first assertion of error is without merit.

> **B.  The ALJ did not breach his duty to fully and fairly develop the record by not requiring C.L.G.'s doctors to provide additional detail and explanations of their records and by not soliciting testimony from additional witnesses.**

Plaintiff next argues that the ALJ "did not develop the medical records" because "he did not require doctors to give more detail and explanations to the records." (Doc. 19 at 4). Plaintiff also complains that "[n]o family member who assists with [C.L.G.'s] care, our Minister, Sunday School teacher and no one else we know has been called to provide input." (Id.). The Commissioner counters that the record was more than sufficient to determine whether C.L.G. was disabled, that Plaintiff was

represented by counsel and bore the burden of presenting evidence to support her claim of disability, and that Plaintiff has failed to show any prejudice with regard to the ALJ's development of the record. (Doc. 21 at 4-6). Having reviewed the record at length, the Court finds that Plaintiff's claim is without merit.

It is well-established that a hearing before an ALJ in a Social Security case is inquisitorial and not adversarial. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1269 (11th Cir. 2007). A claimant bears the burden of proving disability and of producing evidence in support of her claim, while the ALJ has "a basic duty to develop a full and fair record." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (per curiam); see also Ingram, 496 F.3d at 1269. Further, "there must be a showing of prejudice before [the court] will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record." Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995). In evaluating the necessity for a remand, the Court is guided by "whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." Id. (citations and internal quotation marks omitted).

Plaintiff contends that the ALJ should have required C.L.G.'s doctors to supplement their treatment records in order "to fully explain [C.L.G.'s] limitations, to what extent and how long it has

been [an] issue, and expected to last." (Doc. 19 at 4). However, an ALJ is only required to recontact a medical source if the totality of the medical evidence is insufficient to determine whether a claimant is disabled. Hale v. Colvin, 2015 U.S. Dist. LEXIS 68339, at *28, 2015 WL 3397939, at *10 (S.D. Ala. Apr. 24, 2015), report and recommendation adopted, 2015 U.S. Dist. LEXIS 67650, 2015 WL 3397628 (S.D. Ala. May 26, 2015); see also Alvarado v. Colvin, 2016 U.S. Dist. LEXIS 85423, at *44, 2016 WL 3551482, at *13 (S.D. Fla. June 30, 2016) (holding that "[b]ecause the totality of the medical evidence was sufficient for the ALJ to make her conclusion," the ALJ was not required to recontact a claimant's treating doctor under Social Security regulations); Wright v. Colvin, 2016 U.S. Dist. LEXIS 114768, at *2, 2016 WL 4500521, at *1 (S.D. Ga. Aug. 26, 2016) ("[T]he mere determination a medical opinion is inconsistent does not require an ALJ recontact the source before discounting that evidence."); Carter v. Berryhill, 2018 U.S. Dist. LEXIS 167552, at *3, 2018 WL 4659443, at *1 (S.D. Ga. Sept. 28, 2018) ("In the event a medical opinion is insufficient to determine if a claimant is disabled, the ALJ has discretion and *may* recontact [the source.]") (emphasis in original) (citation and internal quotation marks omitted).

   In the instant case, the record before the ALJ contained almost 600 pages of medical records alone. This included 2011-2016 treatment records from a number of providers, including

multiple pediatricians and specialists, various therapy records, hospital records, radiographic test results, a mental consultative examination report, and a neurological consultative examination report. The record further included the hearing testimony of C.L.G. and Plaintiff, a written form opinion by C.L.G.'s teacher, educational records, and questionnaires and additional documentation from Plaintiff.

Plaintiff bore the burden of presenting evidence to support C.L.G.'s disability and, because she was represented by counsel at the administrative level, the ALJ was not subject to the heightened duty to develop the record that applies in proceedings involving unrepresented claimants. See Pennington v. Comm'r of Soc. Sec., 652 F. App'x 862, 872 (11th Cir. 2016) (per curiam). The Court notes that neither Plaintiff nor her counsel suggested at the administrative hearing that the ALJ should obtain additional forms, records, or explanations from C.L.G.'s doctors. Nor did they suggest, as Plaintiff does now, that the records of C.L.G.'s providers, including Dr. Maertens, were inconsistent with their recommended treatment. Further, despite the copious medical evidence in the record at the time of the hearing, the ALJ held the record open thirty days for additional evidence and sent C.L.G. for a consultative neurological examination with Dr. Chalhub after the administrative hearing. (Doc. 17 at 98-99).

Plaintiff also suggests that the ALJ should have solicited

input from other family members of C.L.G. and from C.L.G.'s minister and Sunday school teacher. (Doc. 19 at 4). However, she does not explain what additional information these individuals could provide that was not already included in the reams of medical and other evidence or the testimony of C.L.G. and his mother. Moreover, Plaintiff points to nothing that prevented her from bringing these individuals to the administrative hearing or prevented her attorney from calling them as witnesses.

The record does not establish that further "detail and explanations to the records" were necessary to enable the ALJ to make an informed decision, or that it was necessary for the ALJ to solicit the testimony of additional family members or officials at Plaintiff's church. The ALJ had five years of voluminous treatment and therapy records, radiographic test results, two consultative examination reports, a teacher questionnaire, and educational records. The ALJ also had the testimony of both Plaintiff and C.L.G., along with other documentation supplied by Plaintiff. In sum, there were no discernible evidentiary gaps in the record which resulted in unfairness or clear prejudice to Plaintiff, and the record was sufficient to enable to ALJ to reach his conclusion. Accordingly, Plaintiff has not demonstrated that the ALJ erred in failing to fully and fairly develop the record by not requiring C.L.G.'s doctors to provide additional forms, details, or explanations regarding their records and by not calling additional

witnesses.

C. **Substantial evidence supports the ALJ's assignment of great weight to the opinions of C.L.G.'s consultative neurological examiner.**

Plaintiff argues that the ALJ erred in affording too much weight to the opinions of the consultative neurological examiner, Dr. Chalhub. (Id.). Plaintiff asserts that Dr. Chalhub's report was based on a brief, inadequate examination. (Id.). In response, the Commissioner notes that Plaintiff and her attorney raised no objections to Dr. Chalhub's report or concerns as to the thoroughness of his examination at the administrative level, despite having the opportunity to do so. (Doc. 21 at 7). The Commissioner also points out that Plaintiff does not dispute the ALJ's finding that Dr. Chalhub's report was consistent with the record as a whole. (Id.). Having carefully reviewed the record in this case, the Court finds that Plaintiff's claim is without merit.

As part of the disability determination process, the ALJ is tasked with weighing the opinions and findings of treating, examining, and non-examining physicians. In reaching a decision, the ALJ must specify the weight given to different medical opinions and the reasons for doing so. See Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011). The failure to do so is reversible error. See Williams v. Astrue, 2009 U.S. Dist. LEXIS 12010, at *4, 2009 WL 413541, at *1 (M.D. Fla. Feb. 18, 2009).

31

The ALJ must give "substantial weight" to the opinion of a claimant's treating physician, unless "good cause" exists for not doing so.  Costigan v. Comm'r, Soc. Sec. Admin., 603 F. App'x 783, 788 (11th Cir. 2015) (per curiam) (citing Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (per curiam)). "The opinion of a one-time examining physician" is not entitled to the same deference as that of a treating physician.  Petty v. Astrue, 2010 U.S. Dist. LEXIS 24516, at *50, 2010 WL 989605, at *14 (N.D. Fla. Feb. 18, 2010) (citing Crawford, 363 F.3d at 1160).

Whether considering the opinions of treating, examining, or non-examining physicians, good cause to discredit the testimony of *any* medical source exists when it is contrary to or unsupported by the evidence of record.  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004).  "Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence."  Hogan v. Astrue, 2012 U.S. Dist. LEXIS 108512, at *8, 2012 WL 3155570, at *3 (M.D. Ala. Aug. 3, 2012).  The ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Sryock, 764 F.2d at 835 (citation omitted); see also Adamo v. Comm'r of Soc. Sec., 365 F. App'x 209, 212 (11th Cir. 2010) (per curiam) ("The ALJ may reject any medical opinion if the evidence supports a contrary finding.").

In this case, Dr. Chalhub opined that C.L.G. has a history of

prematurity and spastic paraparesis, much improved, and that
C.L.G.'s seizure disorder appeared to be reasonably well-
controlled. (Doc. 17 at 861). Dr. Chalhub also opined that
Plaintiff did not appear to need his AFOs, as he did not toe walk
and had no limitation in terms of weakness. (Id.). The ALJ
accorded great weight to Dr. Chalhub's opinions, finding that they
were consistent with the record as a whole, including Dr. Chalhub's
own examination findings and Dr. Handwerger's 2016 treatment notes
showing that C.L.G. was able to ambulate in his office without
limitation. (Id. at 24).

Plaintiff does not contest the ALJ's finding that Dr.
Chalhub's opinions were consistent with the record as a whole.
Instead, Plaintiff complains that the ALJ gave Dr. Chalhub's
opinions too much weight because, according to her, he only
examined C.L.G. once for fifteen to twenty minutes, he asked few
questions to C.L.G. and none to C.L.G.'s mother or grandmother,
and he only touched C.L.G. in order to measure his head
circumference and did not check anything else. (Doc. 19 at 4).
As a threshold matter, the Court notes that Plaintiff has not
proffered any medical basis for questioning the thoroughness and
sufficiency of the neurological examination performed by Dr.
Chalhub, a qualified specialist in the field. Further, she has
not pointed to any medical evidence that refutes Dr. Chalhub's
findings. And, the record reflects that because Dr. Chalhub's

report was obtained after the administrative hearing, the ALJ notified Plaintiff's attorney that he intended to enter the report into the record and gave Plaintiff's attorney the opportunity to submit written comments concerning the evidence, submit a written statement of the case in light of the evidence, submit additional records for the ALJ to consider, submit written questions to Dr. Chalhub, and request a supplemental hearing and the opportunity to question witnesses, including Dr. Chalhub. (Doc. 17 at 276). There is no indication that Plaintiff or her attorney objected to the report, submitted questions for Dr. Chalhub, or requested a supplemental hearing with the opportunity to question Dr. Chalhub.

Moreover, there is substantial evidence in the record to support the ALJ's determination that Dr. Chalhub's opinions were entitled to great weight. With regard to Dr. Chalhub's opinions concerning C.L.G.'s gait, the ALJ specifically referenced the records of Dr. Handwerger, who noted no gait abnormalities or difficulty ambulating during any of C.L.G.'s dates of treatment in 2015 and early 2016. This was consistent with the "marked" improvements noted by Dr. Maertens in December 2014, and with the 2013-2014 examination findings of Dr. Hall, who noted no musculoskeletal abnormalities, normal gait and stance, normal movement of all extremities, no motor dysfunction, and no coordination or cerebellum abnormalities. (Doc. 17 at 424, 432, 440). It was also consistent with the 2014-2016 records of Dr.

Dobbs, who noted normal growth and development, normal movement of all extremities, normal muscle tone and strength, normal reflexes, no tenderness to palpation of the hips and knees, no pain elicited by hip or knee motion, normal motor strength, and normal gait and stance. (Id. at 450, 452, 834-40, 842-43, 845). Additionally, in May 2015, the consultative mental examiner, Dr. Jackson, observed that C.L.G. displayed no obvious difficulties with fine or gross motor skills. (Id. at 761). As the ALJ also noted, Dr. Chalhub himself observed that C.L.G. did not toe walk and had 5/5 strength, which was consistent with his opinion. (Id. at 861).

Dr. Chalhub's statement that C.L.G.'s seizure disorder appeared to be reasonably well-controlled on medication is similarly consistent with the evidence of record, including Dr. Chalhub's own notes that C.L.G. had had no recent seizures (id. at 860), and with Dr. Maertens' December 2014 notes that C.L.G. "used to fall all the time, due to jerks, and those falls are markedly improved. They still occur on occasion, but much less." (Id. at 475). Indeed, after C.L.G. was prescribed seizure medication, the record is largely devoid of specific complaints, notations, or observations by medical providers regarding ongoing seizures or related symptoms. Notably, as of January 2016, Plaintiff was not even giving C.L.G. a full dose of Keppra as she had been directed to by C.L.G.'s neurologist. (See id. at 836-37).

After reviewing the record at length, the Court finds that

the ALJ's assignment of great weight to Dr. Chalhub's opinions was supported by substantial evidence, as Dr. Chalhub's opinions are generally consistent with the record evidence as a whole. Accordingly, the ALJ did not err by giving great weight to the opinions of Dr. Chalhub.

### D. The ALJ did not err in according great weight to the teacher assessment of Philonese Nobles Reed.

Plaintiff also argues that the ALJ gave too much weight to the teacher questionnaire submitted by C.L.G.'s general education pre-kindergarten teacher, Philonese Nobles Reed. (Doc. 19 at 4). Plaintiff asserts that the ALJ improperly focused only on Ms. Reed's teacher questionnaire when there were "several [teacher assessments] in the file up to current date regarding on-going problems [C.L.G.] continues to experience." (Id.). The Commissioner counters that Plaintiff has failed to identify any error in the ALJ's assessment of Ms. Reed's opinion. (Doc. 21 at 7).

Teachers, and other non-medical personnel who are able to observe and interact with a child on a daily basis, "are valuable resources in determining the severity of a child's impairment and how a child typically functions compared to other children his age." Cox v. Astrue, 2012 U.S. Dist. LEXIS 44958, at *25, 2012 WL 1094443, at *8 (S.D. Ala. Mar. 30, 2012). Although the ALJ is required to consider the opinions of "other sources" such as school

teachers, "non-medical testimony can neither establish the existence of a medically determinable impairment, nor establish disability absent corroborating competent medical evidence." Cox, 2012 U.S. Dist. LEXIS 44958, at *26, 2012 WL 1094443, at *9 (citations omitted).

On August 22, 2016, Ms. Reed completed a teacher questionnaire, in which she stated that she had known C.L.G. for approximately ten months and that she saw him every day of the school week during that time. (Doc. 17 at 268). Ms. Reed opined that C.L.G. had slight or obvious, but not serious, problems in the functional domains of acquiring and using information, attending and completing tasks, and interacting and relating with others, no problems in the domains of moving about and manipulating objects and caring for himself, and she declined to offer an opinion as to his health and physical well-being. (Id. at 269-74). The ALJ gave great weight to Ms. Reed's teacher questionnaire because she observed C.L.G. in a classroom setting on a regular basis and appeared to have only made assessments based on her own knowledge and observations. (Id. at 24). In his functional equivalence analysis, the ALJ referred heavily to the teacher questionnaire completed by Ms. Reed, as well as the school records from Ms. Reed that listed C.L.G.'s marks in areas within the general categories of reading readiness, general knowledge, math readiness, visual/motor development, speaking and listening, and

developing a community.  (See id. at 26-31, 267).

Plaintiff contends that the ALJ gave "[t]oo much weight" to Ms. Reed's teacher questionnaire because there were "several" teacher assessments in the file.  (Doc. 19 at 4).  However, the record reflects that Ms. Reed's questionnaire was the only teacher assessment on file at the time the ALJ rendered his decision.[5]

---

[5]     Shortly after the ALJ rendered his decision, Plaintiff submitted an additional teacher questionnaire dated May 1, 2017 and completed by Suzanne Lewis, C.L.G.'s kindergarten teacher. (Doc. 17 at 47-55).  Plaintiff also submitted a letter written by Ms. Lewis and a letter from the Saraland Board of Education advising that C.L.G. had excessive unexcused absences and/or tardies during the 2016-2017 school year.  (Id. at 46, 55-56). The Appeals Council declined to consider Plaintiff's submissions, and Plaintiff has not challenged the Appeal Council's denial of her request for review.  Based upon a review of Plaintiff's submissions, the undersigned finds that, assuming arguendo that Plaintiff had challenged the Appeal Council's denial, there is not a "reasonable probability" that these documents would have changed the outcome of the case.  First of all, there is nothing before the Court that indicates that C.L.G.'s excessive absences or tardiness were at all related to his medical conditions or issues in the classroom.  Further, the bulk of Ms. Lewis' opinions related to C.L.G.'s difficulties paying attention and following directions and her concern that his grades would begin to suffer; however, Ms. Lewis does not state that any of C.L.G.'s grades had in fact suffered, or that he had failed to master the information necessary to advance to the next grade level.  Moreover, as discussed infra, the record contains ample evidence to support the ALJ's functional domain limitations, including, but certainly not limited to, the teacher questionnaire completed by Ms. Reed.  Given all of this evidence, there is not a "reasonable probability" that the ALJ would have found marked limitations in two functional domains or an extreme limitation in one domain had he considered the additional teacher questionnaire and letter completed by Ms. Lewis.  See Beavers v. Soc. Sec. Admin., Comm'r, 601 F. App'x 818, 823 (11th Cir. 2015) (per curiam); 20 C.F.R. § 416.1470(a)(5).

Moreover, Plaintiff has not articulated *any* specific error, much less harmful error, in the ALJ's treatment of Ms. Reed's questionnaire, and no such error is apparent to the undersigned. Even if Ms. Reed's teacher questionnaire were excluded, the ALJ's functional domain limitations are nevertheless supported by substantial evidence, such as C.L.G.'s medical treatment records, including those of Drs. Maertens, Hall, Dobbs, and Handwerger, documenting that C.L.G. was improving, alert, cooperative, interacted well, had good social skills, had normal developmental milestones, and had normal movement, normal strength, normal gait and stance, and no motor dysfunction; the occupational therapy and parent-child interaction therapy records demonstrating significant progress and improvements in functioning; C.L.G.'s February 2015 occupational therapy evaluation evidencing age-appropriate grasping, visual motor, balance, motor processing, visual processing, fine motor skills, and projected action sequence skills, along with a recommendation that no additional occupation therapy was needed; C.L.G.'s February 2015 speech evaluation that revealed normal language and articulation skills; the objective findings of Dr. Jackson, who observed that C.L.G. was pleasant and cooperative, had no difficulties with fine or gross motor skills, had appropriate mood and affect, attended to instructions without apparent difficulty, and displayed no unusual behaviors or signs of hyperactivity; the report of Dr. Chalhub, noting that C.L.G. no

longer toe walked and had full strength; and the pre-kindergarten educational records from Ms. Reed, reflecting that C.L.G. could work cooperatively and play well with peers, follow instructions, sustain attention to tasks, listen and understand increasingly complex language, count in sequence to twenty-nine, jump, hop, and skip, cut with scissors along the lines, trace simple things, and use glue appropriately.  Thus, even assuming *arguendo* that the ALJ somehow erred in according great weight to Ms. Reed's assessment, such error was harmless because substantial evidence supports the ALJ's determination.  Accordingly, Plaintiff's claim must fail.

### E.  The record does not reflect that the ALJ cherry-picked evidence to make a case for denial.

Plaintiff next claims that the ALJ cherry-picked evidence, stating that "it appears certain information was selected to make a case for denial while other relevant information was either not considered or minimally considered that if given more serious weight could have possibly led to a different ruling."  (Doc. 19 at 4).  The Commissioner counters that Plaintiff fails to identify any specific evidence in the record that the ALJ should have considered but did not.  (Doc. 21 at 8).  Having carefully reviewed the record in this case, the Court finds that Plaintiff's claim is without merit.

The ALJ's opinion does not reflect that he cherry-picked information to make a case for denial, but rather that he was

intimately familiar with and considered the record as a whole. Indeed, the ALJ's decision shows that he fairly considered and cited evidence both favorable and unfavorable to Plaintiff, including, *inter alia*, the seizure-like activity on the July 2014 EEG; the abnormal findings during C.L.G.'s February 2015 physical therapy examination and the physical therapist's recommendation for bilateral AFOs; C.L.G.'s problems in social participation, visual processing, and tactile processing scored on the Sensory Processing Measure completed by Plaintiff at the occupational therapy evaluation in February 2015; the complaints of headaches and leg pain to Dr. Dobbs; C.L.G.'s inability to spell "cat" or count to ten during his examination by Dr. Jackson; and Dr. Jackson's diagnostic impression of a disruptive behavior disorder, not otherwise specified. (See Doc. 17 at 21-23). In sum, a comparison of the record evidence and the ALJ's decision does not support Plaintiff's assertion that the ALJ selectively cited or discussed evidence. Further, the law is well-settled that even if there is evidence in the record to support an alternative finding, a reviewing court must uphold the ALJ's decision if there is substantial evidence in the record to the support the decision. See Crawford, 363 F.3d at 1158-59. Upon consideration, the undersigned finds that substantial evidence exists in the record to support the ruling of the ALJ.

## F.    The ALJ did not err in his evaluation of
##          Plaintiff's subjective complaints.

Lastly, Plaintiff contends that the ALJ did not consider her
personal credibility.   The Commissioner counters that, to the
contrary, the ALJ expressly considered Plaintiff's statements
concerning the intensity, persistence, and limiting effects of
C.L.G.'s symptoms and found them unpersuasive and "not especially
consistent" with the other evidence of record.

When a claimant attempts to establish disability based in
part on subjective statements of symptoms, the claimant must first
produce (1) evidence of an underlying medical condition, and either
(2) objective medical evidence that confirms the severity of the
alleged symptoms arising from that condition or (3) evidence that
the objectively determined medical condition is of such a severity
that it could reasonably be expected to cause the symptoms alleged.
Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (per
curiam).  When the claimant establishes an impairment that could
reasonably be expected to produce the claimant's alleged symptoms,
the ALJ must then evaluate the extent to which the intensity and
persistence of the alleged symptoms limit the child claimant's
functioning.   20 C.F.R. § 416.929(c)(1).[6]  In doing so, the ALJ

_____

[6]    Social Security Ruling 16-3p provides:

Consistent  with  our  regulations,  we  instruct  our
adjudicators  to  consider  all  of  the  evidence  in  an
individual's record when they evaluate the intensity and

considers all of the available evidence about how the claimant's symptoms affect him.  Id.

If a child claimant "is unable to adequately describe his symptoms, the person who is most familiar with the child, such as a parent, other relative, or guardian may describe the child's symptoms."  Starke v. Colvin, 2016 U.S. Dist. LEXIS 184723, at *45, 2016 WL 8453698, at *15 (N.D. Fla. Nov. 21, 2016) (citing 20 C.F.R. § 416.928(a)).  The ALJ will then examine the statements of the claimant, or the person most familiar with him, about the

persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms.  We evaluate the intensity and persistence of an individual's symptoms so we can determine . . . how symptoms limit ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.
. . . .
In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation.  The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person.  Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms . . . limit the child's ability to function independently, appropriately, and effectively in an age-appropriate manner.

SSR 16-3p, 82 Fed. Reg. 49462, 49463, 49467 (S.S.A. Oct. 25, 2017).

intensity, persistence, and limiting effects of symptoms in relation to all other evidence and consider whether there are inconsistencies or conflicts between those statements and the record. Strickland v. Comm'r of Soc. Sec., 516 F. App'x 829, 831-32 (11th Cir. 2013) (per curiam). The ALJ is not required to accept a claimant's statements about his symptoms. Spears v. Berryhill, 2017 U.S. Dist. LEXIS 160385, at *16, 2017 WL 4340508, at *6 (N.D. Ala. Sept. 29, 2017). However, if the ALJ decides not to credit a claimant's statements as to his subjective symptoms, "the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious as to the credibility finding." Strickland, 516 F. App'x at 832 (citing Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (per curiam)). Failure to articulate the reasons for discrediting testimony related to subjective symptoms requires, as a matter of law, that the testimony be accepted as true. Holt, 921 F.2d at 1223. When the ALJ's reasons for discrediting a claimant's statements about the intensity, persistence, and limiting effects of symptoms are clearly articulated and supported by substantial evidence in the record, a reviewing court will not disturb the ALJ's findings. Foote, 67 F.3d at 1562.

In evaluating Plaintiff's statements concerning the intensity, persistence, and limiting effects of her son's symptoms, the ALJ followed the process outlined above. The ALJ

44

summarized C.L.G.'s testimony and described Plaintiff's statements of his symptoms, including, *inter alia*, Plaintiff's statements that C.L.G. continued to walk on his toes, continued to randomly fall four or five times a day, continued to have tics and jerking with a bigger seizure about every two months, had migraine headaches a couple of times per week which were intense and usually caused C.L.G. to sleep for 90 to 120 minutes, had a bad sleeping problem, and had ADHD symptoms according to his doctor. (Doc. 17 at 20).

The ALJ found that C.L.G.'s medically determinable impairments "could reasonably be expected to produce only some of his alleged symptoms[,]" and that Plaintiff's statements concerning the intensity, persistence, and limiting effects of C.L.G.'s symptoms were "not especially consistent with the medical evidence and other documentary evidence of record, nor are they very persuasive." (Id.). Specifically, the ALJ noted that the evidence of record showed that C.L.G.'s seizure disorder was relatively well-controlled with medication and did not support Plaintiff's assertions as to the frequency and severity of C.L.G.'s seizure episodes. (Id. at 21). The ALJ also noted that the evidence of record showed very mild cerebral palsy with associated developmental delays that were mostly resolved. (Id.). The ALJ then discussed the medical evidence in detail, including Dr. Maertens' December 2014 treatment notes that C.L.G. was improving

markedly, falling much less frequently, and sleeping well with Clonidine; Plaintiff's statement during the February 2015 physical therapy evaluation C.L.G. fell two or three times *per week*; Dr. Dobbs' notes that Plaintiff was not giving C.L.G. his full dose of Keppra; and Dr. Chalhub's report noting that C.L.G. had excellent seizure control and no recent seizures. (See id. at 21-24). The ALJ also referenced C.L.G.'s normal speech evaluations in 2012 and 2015; Dr. Maertens' June 2014 notes that three-year-old C.L.G. knew his shapes, colors, and parts of the body; occupational therapy reports showing that C.L.G. interacted well, displayed less distracted behavior and no inappropriate behaviors, and was making great progress; parent-child interaction therapy records showing that C.L.G. had a significant improvement in behavior and was at a generally higher of functioning at the time of graduation; the February 2015 occupational therapy evaluation noting that C.L.G. was performing with success in his environments; the generally normal objective findings reflected in the treatment notes of Drs. Dobbs and Handwerger, including normal gait and no difficulty ambulating; Dr. Jackson's observations that C.L.G. was cooperative, had appropriate mood and affect, attended to instructions without apparent difficulty, and did not appear distracted or to have trouble concentrating; and Dr. Chalhub's observation that, contrary to Plaintiff's testimony, C.L.G. did not walk on his toes. (See id.).

In view of the foregoing, the record flatly contradicts Plaintiff's assertion that the ALJ did not consider her credibility. The ALJ followed the proper process for evaluating Plaintiff's subjective statements regarding C.L.G.'s symptoms, and the reasons given by the ALJ in support of his assessment of Plaintiff's subjective complaints, outlined above, are abundantly clear and well-supported by specifically identified substantial evidence. Accordingly, the Court finds no error in the ALJ's evaluation of Plaintiff's statements about the intensity, persistence, and limiting effects of her son's symptoms. Therefore, Plaintiff's claim is without merit.

## VIII.     Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **RECOMMENDED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for child supplemental security income be **AFFIRMED.**

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The

parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific finding or specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **12th** day of **August, 2019.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**